Filed 12/4/23  P. v. Taylor CA1/5
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br> v. <br> CURTYS TAYLOR, <br><br> Defendant and Appellant. | A163461 <br><br><br> (Alameda County <br> Super. Ct. No. 16CR013331B) |

This is an appeal from final judgment after a jury convicted defendant Curtys Taylor of first degree murder and conspiracy to commit murder.  On appeal, defendant raises three issues.  The first issue relates to the adequacy of the trial court's response to a jury question.  The latter two relate to the propriety of jury instructions on failure to explain or deny inculpatory evidence (CALCRIM No. 361) and consciousness of guilt (CALCRIM No. 372). None has merit.

However, the parties agree clerical errors in the clerk's minutes and abstract of judgment (five total) must be corrected.  We order these clerical errors to be corrected and otherwise affirm the judgment.

1

**FACTUAL AND PROCEDURAL BACKGROUND**

On November 7, 2016, a felony complaint[1] was filed charging defendant and codefendant Laura Rodgers with first degree murder (Pen. Code, § 187, subd. (a); first count)[2] and conspiracy to commit murder (§ 182, subd. (a)(1); second count). As to codefendant, it was alleged she personally used a deadly weapon, a knife, in the commission of the murder. She entered an open plea bargain prior to trial.

## I. *The Prosecution's Case.*

Defendant's jury trial began on April 12, 2021, and revealed the following evidence. Defendant and codefendant met at a youth center in 2011 when they were both 17 years old. Approximately a year later, they began dating. In 2015, defendant moved into codefendant's house where she lived with her parents. However, in March 2016, defendant punched codefendant in the face after discovering flirtatious text messages she exchanged with her restaurant coworker Karla Ramirez (Ramirez).[3] Codefendant's parents demanded that defendant move out, which he did. Codefendant's mother also advised codefendant to end her relationship with defendant, but codefendant insisted it was better to do what he said.

Around this time, Ramirez told a friend that codefendant had a boyfriend who did not want codefendant to be around her. Shortly thereafter, codefendant got a new job, left the restaurant, and stopped communicating with Ramirez.

---

[1] The operative first amended complaint was filed on April 29, 2021.

[2] Unless otherwise stated, all statutory citations herein are to the Penal Code.

[3] Defendant later discovered that codefendant had been sexually active with Ramirez.

2

## A. Murder Plans.

On May 5, 2016, codefendant cryptically wrote in her diary that she felt horrible about what she caused and would be a better person even if she had to kill for it.

Codefendant's parents began to notice that she lost a lot of weight, seemed depressed, and did not spend time out of the house or with her friends. Moreover, while codefendant used to care about her appearance, she cut off all of her hair, wore scarves and long clothing, and generally behaved as if she did not want people to see her. Codefendant spent a lot of time reporting to defendant where she was and what she was doing. She told her father that they should move because defendant was going to have people harm the family.

Defendant texted codefendant repeatedly about her relationship with Ramirez. He accused her of lying and admitted it was " 'eating [him] . . . .' " Codefendant replied that she was having trouble staying honest because she was afraid of him and concerned for her family's safety. Defendant responded that they were not safe unless she " 'women up [*sic*]' " about the truth and warned that he would let the belt speak for him.

In the fall of 2016, defendant and codefendant developed a plan to kill Ramirez. Codefendant texted defendant: " 'I'm thinking now what it'll be like to kill and . . . it's making me feel like laughing.' " The next day, defendant asked codefendant whether she wanted to do " 'that one thing' " to " 'eliminat[e] [her] past,' " and she replied, " '[T]hat's still on.' " Defendant began keeping codefendant on the phone when she conversed with others so that he could overhear them. Codefendant deposited her work income into his bank account. They also plotted to kill codefendant's sister. When defendant asked codefendant whom she preferred to kill first, she chose her

sister, to " '[g]et it over with.' " Defendant then asked whether she preferred to " 'skip' " Ramirez. Codefendant replied: " 'I honestly don't care any more [*sic*] about killing her because what I'm going to do to my sister is taking all my energy but I'll still do it like it's nothing.' "

On September 17, 2016, codefendant texted defendant that she was fine as long as he was only going to beat her with a belt and not harm her parents. She added that " 'killing her' " would " 'make things better' " between them. Defendant responded: " 'Thats [*sic*] good and yeah.' "

On October 1, 2016, codefendant asked defendant if they were going to communicate about the plan with " 'aroyal [*sic*].' " A few days later, codefendant wrote in her diary that the success of the " 'Aroyal Park [*sic*]' "[4] plan depended on not letting doubt enter her mind " 'because we know and believe that it's going to be effortless to contact her leaving that action spotless and we know it's so easy and effortless to get her to meet up . . . .' "

On October 23, 2016, codefendant returned to the restaurant where she previously worked with Ramirez. Codefendant received a new contact number for Ramirez from a former coworker and left a "new" number for herself for the coworker to give to Ramirez. In actuality, codefendant gave the coworker defendant's phone number, and defendant began to exchange text messages with Ramirez while pretending to be codefendant. In one such text, defendant, posing as codefendant, told Ramirez her former boyfriend was no longer in her life.

On October 25, 2016, defendant, still posing as codefendant, told Ramirez there was a " 'surprise' " and wanted to meet up with her. Ramirez later told friends that she had a plan to meet codefendant on November 2, 2016, for a meal.

---

[4] This is a reference to Arroyo Viejo Park.

4

**B.** **November 2, 2016, Murder.**

On November 2, 2016, Ramirez exchanged numerous texts with defendant, believing she was communicating with codefendant. Just before 7 p.m., defendant used codefendant's debit card to purchase gloves and a head lamp from a local drugstore. He also purchased a gas can at an auto parts store, which he filled with gas at a local gas station at 8:48 p.m. At 9:43 p.m., defendant began a 44-minute phone call with codefendant. During the call, his cell phone pinged off of a cellular tower that covered an area that included the drugstore, auto parts store, and gas station where he made the above mentioned purchases. The tower also covered Arroyo Viejo Park.

At 10:15 p.m., Ramirez texted codefendant that she was outside codefendant's house. Codefendant's father watched as codefendant entered Ramirez's car, a white Chevrolet, and drove away.

At 11:15 p.m., defendant bought disinfecting wipes. Around midnight, defendant and codefendant checked into a local motel where they were observed to be acting affectionately.

About 2:00 a.m. on November 3, 2016, Ramirez's mother realized her daughter had not returned home. Two of Ramirez's friends drove to codefendant's house and knocked on the door. When codefendant cracked open the door, the friends said they were looking for Ramirez. Appearing nervous, codefendant said she was not dressed and asked them to leave. One of Ramirez's friends then called Deputy Sheriff Silva, who advised her to make a missing person report, which she did.

Around noon, the same day, a man and two young children were walking in Arroyo Viejo Park when they discovered a body lying face down under a bridge. Police later identified this dead person as Ramirez, who had been stabbed approximately 36 times and partially set afire.

On November 4, 2016, police officers searched a dumpster behind the motel where defendant and codefendant stayed. They found a black jacket belonging to Ramirez, a binder with Ramirez's name on it, bloodstained clothes, and a bag containing Ramirez's wallet. The police also recovered Ramirez's Chevrolet Cruze, parked outside a BART station. They were unable to obtain prints from the car door, as it had been wiped with some type of liquid.

Later that day, defendant was arrested. Police found Ramirez's car key in his jacket pocket and her DNA on his jeans and shoes.

## II.   *Defense Case.*

Defendant testified that he did not kill Ramirez and did not believe at the time that codefendant would kill her. Defendant also denied hitting codefendant with a belt or forcing her to give him money. He acknowledged that she sometimes gave him money and that he asked her to directly deposit her paychecks into his bank account.

Defendant acknowledged slapping codefendant after discovering she was having an affair with Ramirez but said that was the only time he hit her. Afterward, defendant was mad at codefendant (not Ramirez) and began to drink and smoke marijuana daily. He became paranoid and began listening to codefendant's phone conversations. Yet, it was codefendant who told him that she wanted to kill Ramirez to "eliminate her past." Defendant did not believe her and said it was a bad idea. He refused to get her a gun.

Defendant sometimes allowed codefendant to text Ramirez from his phone, and if codefendant was not around, he sometimes texted Ramirez "freestyle." Defendant knew codefendant wanted to lure Ramirez to her house and then to the creek on November 2, 2016, but he did not know she had a knife. He thought codefendant intended to break up with Ramirez or

6

"tell her why she regretted doing what she did for me to hear." He agreed to put matches and a gas can near the creek but thought that codefendant was just "stringing [him] along" about killing Ramirez.

On the day in question, defendant left matches and the gas can at the creek around 2:00 p.m., and then went to his cousin's house, which was less than a mile away. When Ramirez texted him, believing he was codefendant, to say that she was outside, defendant gave the message to codefendant. Defendant was later on the phone with codefendant when he heard Ramirez screaming. He ran to the creek, arriving within minutes. Once there, defendant saw codefendant stabbing Ramirez and made her stop. He then helped codefendant, because he did not want her to go to jail, by throwing Ramirez's clothes in the dumpster behind the motel and getting rid of codefendant's knife. Admittedly, defendant told the police that it was his idea to burn Ramirez's body because he wanted to protect codefendant. However, defendant did not intend for codefendant to kill Ramirez or make any agreement for her to do so.

## III.  *The Verdict, Sentencing and Appeal.*

On April 29, 2021, the jury found defendant guilty as charged. The trial court then sentenced him to an indeterminate term of 25 years to life in prison. This timely appeal followed.

## DISCUSSION

Defendant argues on appeal the trial court prejudicially erred by (1) failing to provide an adequate answer to a jury question in violation of section 1138 and his due process rights under the Fourteenth Amendment of the federal Constitution;[5] (2) giving CALCRIM No. 361, failure to explain or

---

[5] Each of defendant's constitutional claims arises under the federal Constitution.

7

deny evidence, without an adequate factual basis in violation of his rights under the Fifth, Sixth and Fourteenth Amendments; and (3) giving CALCRIM No. 372, consciousness of guilt, in violation of his rights to due process and proof of guilt beyond a reasonable doubt under the Sixth and Fourteenth Amendments. We address each claim in turn *post*.

## I. *The Court's Jury Question Response Was Adequate.*

Defendant contends the trial court violated section 1138 and his due process rights to a jury adequately instructed on the law and to a verdict based on proof beyond a reasonable doubt when the court answered a jury question by referring the jury to instructions that had already been given. During deliberations, the jury asked by written note: "520. Pen. Code, § 187. 'The defendant . . . person.' Does the act of calling and texting [Ramirez] to come to the Arroyo Viejo Park on November 2nd 2016 and . . . buying the supplies to set [Ramirez's] body on fire to conceal the evidence, constitute as 'an act that caused the death of another person?' If [defendant] did not stab [Ramirez] to cause her to bleed to death, are the above 2 acts enough to be counted as 'acts that caused the death.' " (*Sic.*) In response, the trial court advised the jury: "Your question as to whether or not certain actions of the defendant caused the death of Karla Ramirez is for you as a jury to decide. [¶] Please refer Jury Instructions 400—Aiding and Abetting, 401—Aiding and Abetting: Intended Crimes, 443—Compelling Another to Commit Crime, 548—Murder: Alternative Theories, 520—First or Second Degree Murder and 521 First Degree Murder." (*Sic.*) This response was proper.

Section 1138 provides in relevant part that when the jury "desire[s] to be informed on any point of law arising in the case, . . . the information required must be given . . . ." However, as the California Supreme Court explains, while "[t]he court has a primary duty to help the jury understand

8

the legal principles it is asked to apply," the court need not "always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information." (*People v. Beardslee* (1991) 53 Cal.3d 68, 97 (*Beardslee*).) "Indeed, comments diverging from the standard are often risky. [Citation.] The trial court [may be] understandably reluctant to strike out on its own." (*Ibid.*) "In general, errors under section 1138 are reviewed for an abuse of discretion." (*People v. Doane* (2021) 66 Cal.App.5th 965, 980.)

Here, there was no abuse of discretion, as the court gave the jury "full and complete" instructions in the form of CALCRIM Nos. 400, 401, 443, 548, 520 and 521. (*Beardslee, supra*, 53 Cal.3d at p. 97.) These instructions, unchallenged by defendant, correctly advised the jury on the relevant points of law, including that (1) a defendant may be guilty of committing a crime if he or she directly committed the crime *or* if he or she aided and abetted the person who directly committed the crime (CALCRIM No. 400); (2) a defendant aided and abetted a crime if he or she knows the perpetrator's unlawful purpose and "*specifically intend[ed]* to and [did] in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime," whether or not he or she was actually present during its commission (CALCRIM No. 401, italics added); (3) if a defendant forced another person to commit a crime by threatening, menacing, commanding, or coercing that person, then the defendant is guilty of that crime (CALCRIM No. 443); (4) a defendant is guilty of first degree murder if he or she, acting willfully, deliberately and with premeditation, committed an act that caused another person's death (CALCRIM Nos. 520–521); and (5) if you decide the defendant committed murder, it is murder of the second degree, unless the

9

People have proved beyond a reasonable doubt that it is murder of the first degree (*ibid.*).[6] The jury had no additional questions. We thus presume in the absence of contrary evidence the jury followed these and other relevant instructions in evaluating the prosecution's theory that defendant was guilty of first degree murder, even if he did not stab Ramirez or ignite her body, based on the acts he committed to assist codefendant before and after the murder. (*People v. Fuiava* (2012) 53 Cal.4th 662, 669.)

Contrary to defendant's suggestion, this is not a case where it appears the jury misunderstood the governing law; rather, the jury's question related to the significance of certain facts regarding his role in the crimes. (Cf. *People v. Doane, supra*, 66 Cal.App.5th at p. 982.) As such, the trial court properly instructed that "whether or not certain actions of the defendant caused the death of Karla Ramirez is for you as a jury to decide." Had the court gone beyond referring the jury to previously given instructions and instead directed it on how to apply those instructions to the evidence, it

---

[6] Defendant argues a "correct answer would have focused the jury's attention on the portions of the instructions describing the specific intent element in such a way as to make it clear that if that was his only role, and he did not intend that Rodgers kill Ramirez, he was not guilty of murder or of aiding and abetting murder." Yet, these instructions did just that. For example, CALCRIM No. 401 instructed that to be guilty as an aider and abettor, defendant must have "know[n] of the perpetrator's unlawful purpose and . . . specifically intend[ed] to, and d[id] fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime." CALCRIM No. 521, in turn, instructed that to be found guilty of first degree murder, defendant must have acted willfully, deliberately, and with premeditation. The instruction then went on to define each of these terms: "The defendant acted *willfully* if he intended to kill. The defendant acted *deliberately* if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant *acted with premeditation* if he decided to kill before completing the act[s] that caused death."

would have " ' "usurp[ed] the jury's exclusive function as the arbiter of questions of fact and the credibility of witnesses." ' " (*People v. Sanders* (1995) 11 Cal.4th 475, 531.)

Thus, because the trial court fulfilled its duty to provide a full and complete set of instructions, there is no error on this record, statutory or constitutional. Nor is there prejudice. (*People v. Gonzales* (1990) 51 Cal.3d 1179, 1212–1213 [no error or prejudice where the trial court refused to provide additional instructions on malice and resolved the jury's questions by directing them to reread the malice and homicide instructions], superseded by statute on a different point in *In re Steele* (2004) 32 Cal.4th 683; *People v. Brookes* (2017) 3 Cal.5th 1, 97; *Beardslee, supra*, 53 Cal.3d at p. 97 ["A violation of section 1138 does not warrant reversal unless prejudice is shown"].)

## II.     *CALCRIM No. 361 Was Proper.*

Next, defendant contends the trial court prejudicially erred by instructing the jury under CALCRIM No. 361 that "[i]f the defendant failed in his testimony to explain or deny evidence against him and if he could reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt. [¶] If the defendant failed to explain or deny, it is up to you to decide the meaning of that failure." Defendant contends this instruction interfered with his constitutional rights to present a defense and testify on his own behalf by "suggesting to the jury that the explanations and accounts [he] gave in his testimony were so inadequate that they amounted to a failure to explain, merely because they

11

contradicted the prosecution's view of the case." The following principles apply.

A trial court must instruct on the general principles of law relevant to the issues raised by the evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 154, overruled in part on other grounds in *People v. Schuller* (2023) 15 Cal.5th 237, 260, fn. 7.) Where an instruction is requested, the court must give the instruction if it is supported by substantial evidence, meaning "evidence sufficient to deserve jury consideration." (*People v. Marshall* (1997) 15 Cal.4th 1, 39–40.) On appeal, "[t]he independent or de novo standard of review is applicable in assessing whether instructions correctly state the law [citations] and also whether instructions effectively direct a finding adverse to a defendant by removing an issue from the jury's consideration [citations]." (*People v. Posey* (2004) 32 Cal.4th 193, 218.) We consider the court's entire set of instructions rather than the challenged instruction in isolation, and we assume in doing so that the jurors are "capable of understanding and correlating all the instructions which are given to them." (*People v. Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1294; see *People v. Castillo* (1997) 16 Cal.4th 1009, 1016.)

In claiming prejudicial error, defendant relies on case law holding that "[CALCRIM No. 361] applies only when a defendant completely fails to explain or deny incriminating evidence, or claims to lack knowledge and it appears from the evidence that the defendant could reasonably be expected to have [it]." (*People v. Cortez* (2016) 63 Cal.4th 101, 118; accord, *People v. Grandberry* (2009) 35 Cal.App.5th 599, 605–606; *People v. Saddler* (1979) 24 Cal.3d 671, 682–683 (*Saddler*).) Defendant claims this standard was not met.

We disagree. Substantial evidence supported the court's giving CALCRIM No. 361. Defendant's alibi was that while codefendant was

12

murdering Ramirez, he was less than a mile from Arroyo Viejo Park at his cousin Darryl's house on 77th Avenue. Defendant was on the phone with codefendant when he heard Ramirez screaming and ran to the park, arriving within minutes. His phone during this call pinged a tower that covered the area of the park. However, defendant did not know on cross-examination that Darryl's last name was Drake despite the fact that they were together "all the time." Moreover, defendant could not explain why there were no text messages between him and Darryl from September to November 2016. And, when confronted with evidence that Darryl actually lived over a mile from the park, on MacArthur Boulevard, in 2016, in an area served by a different cellular tower than the one his phone pinged, defendant offered no response other than to insist it was not true. On this record, the instruction was proper. (See *People v. Cortez, supra*, 63 Cal.4th at p. 121 [where a defendant claims he or she "did not know" information that he or she "reasonably could be expected to know" from the evidence, CALCRIM No. 361 is appropriate].)

Defendant counters that this evidence was "not particularly significant to the case." We disagree. Defendant's alibi at the time of murder was that he was at his cousin's house, with whom he claimed to be quite close. The jury was entitled to consider his failure to explain why Darryl's home was not where defendant said it was, or to explain why he did not know Darryl's last name, to be quite significant. It is well established that, as the reviewing court, we view the evidence in a light most favorable to the judgment, not to a defendant's appeal. (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1052.)

Moreover, the instruction did not, as defendant claims, shift the burden to him to prove his innocence by inviting the jury to draw the adverse inference against him that his testimony was inadequate merely because it was inconsistent with the prosecution's case. Rather, the instruction

correctly told the jury that *if* defendant failed in his testimony to explain or deny evidence and *if* he could reasonably be expected to have done so based on what he knew, the jury could (but it need not) consider his failure to explain or deny evidence in evaluating the weight of that evidence. And, more importantly, the instruction made clear "the People must still prove him guilty beyond a reasonable doubt."

Defendant is also wrong to claim this instruction was argumentative. It made no reference to specific evidence, and it was phrased so as to emphasize that if the jury found that defendant failed to explain or deny evidence, "it is up to you to decide the meaning of that failure."

Finally, in any event, the trial court instructed the jury under CALCRIM No. 200 that "[s]ome of these instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them." We presume the jury followed this instruction. (*People v. Fuiava, supra*, 53 Cal.4th at p. 669.) Thus, even assuming for the sake of argument CALCRIM No. 361 was not applicable, the jury, following CALCRIM No. 200, would have disregarded it. Thus, there is no reasonable probability that but for the giving of this instruction defendant would have received a more favorable result.[7] (See *Saddler, supra*, 24 Cal.3d at p. 684; *People v. Covarrubias* (2016) 1 Cal.5th 838, 934.)

---

[7] Defendant also insists the heightened standard for prejudice set forth in *Chapman v. California* (1967) 386 U.S. 18, 24, applies because he claims federal constitutional error. The California Supreme Court mandates otherwise. (See *People v. Debose* (2014) 59 Cal.4th 177, 205–206 [where a jury is instructed on an inapplicable legal theory, the error is reviewed for prejudice under the " 'reasonable probability standard' " per *People v. Watson* (1956) 46 Cal.2d 818, 836].)

## III. *CALCRIM No. 372 Was Proper.*

Lastly, defendant contends the trial court prejudicially erred by instructing the jury per CALCRIM No. 372 that "[i]f the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt.  If you conclude that the defendant fled, it is up to you to decide the meaning or importance of that conduct.  However, evidence that the defendant fled or tried to flee cannot prove guilt by itself."  Defendant insists this instruction was argumentative in favor of the prosecution and effectively reduced its burden to prove guilt beyond a reasonable doubt in violation of the Sixth and Fourteenth Amendments.

We agree with the People that defendant's challenge to CALCRIM No. 372 is precluded by the invited error doctrine because defense counsel requested that it be given.  Under California Supreme Court authority, "[t]he invited error doctrine applies when the defense has made a ' " ' "conscious and deliberate tactical choice" ' " ' in asking for the instruction in question." (*People v. Merriman* (2014) 60 Cal.4th 1, 104 (*Merriman*).)

Defendant claims the inclusion of CALCRIM No. 372 on his list of requested jury instructions was not a "deliberate tactical choice" but the result of neglect or mistake.  (See *People v. Graham* (1969) 71 Cal.2d 303, 319.)  Defendant offers no evidence to support his argument; nor does he challenge his attorney's decision as a constitutional violation of the right to effective counsel in criminal trials.  Under these circumstances, his challenge to CALCRIM No. 372 is barred under the invited error doctrine.  (*Merriman, supra*, 60 Cal.4th at p. 104.)

## IV. *Five Record Corrections Are Required.*

The parties correctly agree the following clerical errors in the clerk's minutes and abstract of judgment must be corrected:

15

The clerk's minutes incorrectly state that defendant was "convicted by Plea of Nolo Contendre [*sic*]" and "ordered to serve his sentence in the California State Prison, San Quentin, California . . . ." These minutes should be corrected to reflect that (1) defendant was found guilty as charged by a jury and (2) he was remanded by the trial court to the California Department of Corrections and Rehabilitation to serve out his sentence.

The abstract of judgment incorrectly states that defendant was convicted by a "plea" on December 8, 2020, and, as to the second count, that he was guilty of "Conspriacy [*sic*]" and that his sentence was stayed. The abstract should be corrected to reflect that (1) defendant was convicted by a jury on April 29, 2021; (2) he was guilty of the second count, "Conspiracy"; and (3) for that count he received a stayed 25 years to life sentence.

## DISPOSITION

The trial court is directed to modify the clerk's minutes and abstract of judgment as specified in part IV and to forward a copy of the modified documents to the Department of Corrections and Rehabilitation. The judgment is otherwise affirmed.

Jackson, P. J.

WE CONCUR:

Burns, J.
Chou, J.

A163461/*People v. Curtys Taylor*

16